## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**WILLIE PETERSON,**

    **Petitioner,**

    v.

**CHARLES WARREN, et al.,**

    **Respondents.**

**Civil Action No. 13-4250 (JLL)**

**OPINION**

LINARES, Chief District Judge,

Presently before the Court is a petition for a writ of *habeas corpus* of Willie Peterson ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court manslaughter conviction (ECF No. 6-3). Following an order to answer, Respondents filed a response in opposition to the petition (ECF No. 11). For the following reasons, this Court will deny the petition and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming the denial of Petitioner's petition for post-conviction relief, the Superior Court of New Jersey – Appellate Division summarized the background of this matter as follows:

> Following an eight-day jury trial, defendant was convicted of first-degree aggravated manslaughter, third-degree theft, fourth-degree unlawful possession of a weapon, and third-degree possession of a weapon for an unlawful purpose in the stabbing death of his girlfriend. Defendant was acquitted of felony murder.
>
> At sentencing, the court imposed an extended term sentence under N.J.S.A. 2C:43–7.1(b)(2) on the aggravated manslaughter conviction, ordering defendant's incarceration for sixty years, subject to an eighty-five percent period of parole ineligibility on the first thirty years pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43–7.2. The trial judge merged the weapons

1

convictions and imposed a concurrent five-year term of imprisonment. Finally, the court imposed a consecutive five-year term of imprisonment for the third-degree theft conviction.

On appeal, defendant's convictions were affirmed, as was his extended term sentence for aggravated manslaughter. However, we remanded for resentencing on the convictions for the third-degree offenses of theft and weapons possession. *State v. Peterson*, No. A–1930–03 (App.Div. Mar. 6, 2006) (slip op. at 17). Defendant's petition for certification was denied. *State v. Peterson*, 193 N.J. 223, 936 A.2d 970 (2007).

Defendant's first PCR petition was filed on November 26, 2007. He sought an evidentiary hearing to review claims of trial counsel's negligent representation and imposition of an unlawful sentence. The PCR judge denied defendant's request for a hearing and, following review of the issues presented, denied relief. Defendant filed a pro se motion for reconsideration. The PCR judge issued a letter opinion denying the motion on January 25, 2011.

*State v. Peterson*, 2012 WL 3870319, at *1-2 (N.J. Super. Ct. App. Div. Sept. 7, 2012), *certif.*

*denied*, 221 N.J. 219 (2015).

Shortly after filing a federal *habeas* petition in this Court on July 10, 2013, the Court

granted Petitioner's Motion for Stay and Abeyance in order for him to exhaust claims in the state

court. (ECF Nos. 1, 3). Petitioner subsequently filed a second post-conviction relief ("PCR")

petition on August 13, 2013. (ECF No. 11-12 at 41-47). The second PCR petition denial was

affirmed on procedural default grounds in a *sua sponte* order issued on September 5, 2014. (ECF

No. 11-6). Petitioner filed the instant amended petition for *habeas* relief under § 2254 on April

23, 2015. [1] (ECF No. 6-3). He raises the following claims; the first fifteen of which, were raised

in his initial federal *habeas* filing:

1. Ineffective assistance of trial counsel for inadequate preparation;
2. Ineffective assistance of trial counsel for failing to present a diminished capacity

---

[1] Respondents submit that Petitioner's entire federal *habeas* petition is time barred under AEDPA's statute of limitations. (ECF No. 11 at 59). However, the first fifteen claims were brought in 2013. As to the sixteenth claim, this court need not analyze whether it is timely as it is procedurally defaulted.

defense;

3. Ineffective assistance of trial counsel for failing to move for suppression of portions of Investigator Raccioppi's testimony;
4. Ineffective assistance of trial counsel for failing to suppress Petitioner's statements to police;
5. Ineffective assistance of trial counsel for failing to advise Petitioner of a trial memorandum;
6. Ineffective assistance of trial counsel for failing to engage in meaningful plea negotiations.;
7. Ineffective assistance of trial counsel for failing to advise Petitioner of his potential sentence exposure;
8. Ineffective assistance of PCR counsel for failing to raise Petitioner's absence from certain trial and pre-trial proceedings;
9. Prosecutorial misconduct for improper remarks during closing arguments;
10. Trial court erroneously admitted hearsay statements;
11. Trial court erroneously admitted prejudicial evidence;
12. Trial court erroneously admitted evidence of strained relationship between Petitioner and decedent;
13. Trial court erroneously provided jury instruction on consciousness of guilt;
14. Trial court erroneously failed to provide a jury instruction on witness bias;
15. Trial court erroneously denied Petitioner's motion for new counsel in light of a conflict of interest; and
16. PCR court erroneously denied Petitioner's claims of ineffective assistance and due process violations by the trial court.

## II. **STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of *habeas corpus* [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A *habeas* petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40-41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of *habeas* corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the *dicta*" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. ANALYSIS

The petition raises sixteen grounds for relief, eight of which are ineffective assistance of trial and/or appellate counsel. For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal *habeas* relief.

The standard which applies to Petitioner's ineffective assistance of counsel claims is as follows:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance

4

was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to *habeas* relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

### 1. Ineffective Assistance of Trial Counsel Due to Inadequate Preparation

Petitioner argues that his trial counsel was ineffective insomuch as counsel failed to fully investigate his case and adequately cross-examine key state witnesses. (ECF No. 6-3 at 31-34). While Respondents maintain this claim is procedurally barred, this Court denies the claim on the merits. *See e.g. Bronshtein v. Horn*, 404 F.3d 700, 707-10 (3d Cir. 2005).

In order to make out a claim for *Strickland* prejudice in regards to counsel's alleged failure to investigate and prepare for trial, Petitioner "'must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result.'" *Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016) (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir 2011) (a petitioner making inadequate investigation claims "has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) (same); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

Petitioner asserts, without providing evidentiary support, that had counsel more fully investigated, he would have been able to successfully cross-examine and discredit multiple state witnesses, such as Twanna Floyd, Eric Wiltshire and Investigator Nicole Berrian. (ECF No. 6-3 at 31.) Specifically, with respect to Investigator Berrian, Petitioner asserts that adequate preparation would have allowed his trial counsel to better handle Berrian's "verbal gymnastics game by giving selective and misleading responses to questions." (*Id.*).

As the Appellate Division explained in rejecting this claim on Petitioner's direct appeal, it could not make an ineffectiveness determination under *Strickland* based on Petitioner's "conclusory allegations of ineffective trial preparation." *State v. Peterson*, Docket No. 02-08-3082-I, 2006 WL 533109 at *5 (App. Div. Mar. 6, 2006). State's witness Twanna Floyd, who was the decedent Deborah Belle's neighbor and confidante, testified about the strife in Petitioner and decedent's relationship that was caused by Petitioner's multiple instances of stealing the decedent's personal belongings and pawning them. (ECF No. 12-5 at 18-25). Floyd testified about one of her last encounters with the decedent, where she helped her locate a locksmith to change the locks of the home that decedent shared with Petitioner. (*Id.* at 25-27). According to Floyd, Petitioner's most recent instance of pawning her belongings without her permission incited the decedent's decision to change the locks. (*Id.*). Nonetheless, Floyd testified that Petitioner was back in the decedent's home just days later, much to Floyd's dismay. (*Id.* at 28-31).

State's witness, Eric Wiltshire, who was incarcerated with Petitioner at the Essex County Jail after the decedent's murder, testified about Petitioner's admission that he killed his fiancée and his actions immediately after the murder. (ECF No. 12-9 at 19-23). Wiltshire, who had pending criminal charges of his own, testified that he notified the prosecutor's office of Petitioner's statements with the hopes of securing a favorable plea bargain as a result of his promise to cooperate in Petitioner's murder case. (ECF No. 12-9 at 22-25). Notwithstanding this, Wiltshire's information to law enforcement was verified as information that was not provided to the general public and had to have been obtained from someone intimately familiar with Petitioner's actions on the day of the murder and the days immediately thereafter. (ECF No. 12-6 at 15-18).

Investigator Nicole Berrian of the Essex County Prosecutor's Office testified about her observations of the crime scene and her role in the murder investigation. (ECF No. 12-6 at 2-31).

She explained that law enforcement initially found the decedent in her home after her son, who was away at school, asked the police to check on his mother after days of unsuccessful attempts to reach her by telephone. (*Id.* at 22). Investigator Berrian described the crime scene and the victim's then-slightly decomposed body which was still at the scene. (*Id.* at 3-17). Berrian's responsibilities included locating Petitioner, gathering information about how long the decedent may have been dead and sending evidence for scientific testing. (*Id.*).

The Court's review of the trial record indicates that trial counsel was adequately prepared and conducted a vigorous cross examination of the above-named witnesses. First, with respect to Twanna Floyd, trial counsel familiarized himself with her prior statements to law enforcement. He was able to impeach her on several issues such as (1) the significant delay between when she learned of decedent's murder and when she informed law enforcement of the tension in Petitioner and decedent's relationship; (2) her unfamiliarity with any history of physical violence by Petitioner against the decedent; and (3) her observations of decedent's mounting anger against Petitioner over the course of their relationship. (ECF No. 12-5 at 37-43). Trial counsel also impeached Eric Wiltshire with the beneficial plea agreement he obtained for himself as a result of cooperating in the murder case against the Petitioner. (ECF No. 12-9 at 27-36). Lastly, trial counsel examined Investigator Berrian about her professional observation of the shape and location of the blood spatter throughout the crime scene in order to establish that the decedent was the aggressor, therefore causing Petitioner to sustain injuries and blood loss. (ECF No. 12-6 at 44-57, 77-78). There is nothing in the record that suggests that Investigator's Berrian's testimony was evasive or misleading. Therefore, the record does not support that trial counsel had any basis to impeach the investigator during cross-examination.

Because the facts in the record do not support Petitioner's bald assertion of ineffective assistance, the Appellate Division's conclusion that it could not determine that trial counsel was ineffective is neither contrary to nor an unreasonable application of *Strickland* and its progeny. Here, the Petitioner has not made any showing "that counsel's representation fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 687. Thus, Petitioner is therefore not entitled to *habeas* relief on his ineffective assistance claim.

### 2. Ineffective Assistance of Counsel for Failing to Raise Diminished Capacity

Petitioner next claims that his trial counsel's failure to prepare a diminished capacity defense constituted ineffective assistance. (ECF No. 6-3 at 48). Petitioner argues that his behavior shortly after the murders, which included flagging an officer down on the street and telling him "to take me in" demonstrated that he was suffering from "a mental deficiency." (*Id.*). While Petitioner's *habeas* petition provides minimal supporting facts or allegations, his pleadings in the state courts raised more facts to support this claim. There, Petitioner cited to his suicidal ideations that he expressed to the arresting officers. Additionally, he cited to his declining medical treatment when he was observed to have sustained injuries from a car collision he was involved in shortly after the murder, which was purportedly a suicide attempt. (ECF No. 11-10 at 22).

The state court rejected this argument, opining that neither Petitioner's mental health history nor his behavior after the murder suggested that his murdering the decedent was a result of diminished capacity.

> Defendant's suicidal behavior does not demonstrate he had a diminished capacity, as turning oneself in to the police, confessing to a crime, and feeling remorse after a murder are not signs of diminished capacity. *See State v. Savage*, 120 N.J. 594, 614, 577 A.2d 455 (1990) (illustrating behaviors entitling a defendant to a diminished capacity defense).

> In *Savage*, supra, the Court held trial counsel may be ineffective for not investigating a "psychiatric defense" when defendant "participated in ... bizarre conduct, and possibly had a history of mental illness and drug abuse [.]" *Ibid.* There, the defendant had a history of mental illness and drug abuse, suffered from possible "hallucinations or delusions," used cocaine the night of the murder, and exhibited many symptoms of paranoid schizophrenia. *Ibid.*
>
> The facts of this matter are easily distinguishable from *Savage*, as defendant did not have a history of mental illness, did not claim he was under the influence of drugs at the time of the murder, and did not claim he was having psychiatric "hallucinations or delusions." In contrast, defendant tried to commit suicide, said he wanted to die, and confessed to murder. Moreover, defendant offers no evidence showing prior or current psychiatric or mental health history, and proffers no expert opinion of mental defect.

*Peterson*, 2012 WL 3870319 at *4.

New Jersey law provides that diminished capacity is a mental disease or defect that negates the relevant state of mind required for an offense. N.J. Stat. Ann. § 2C:4-2; *State v. Galloway*, 628 A.2d 735, 743 (N.J. Sup. Ct. 1993).

> Diminished capacity is not an affirmative defense; therefore, defendant does not bear the burden of proof. *See State v. Reyes*, 140 N.J. 344, 357, 658 A.2d 1218 (1995). Instead, diminished capacity may negate intent that is an element of the charged offense. *Id.* at 354, 658 A.2d 1218. However, not every mental disease or defect constitutes diminished capacity sufficient to negate intent. *Id.* at 360, 658 A.2d 1218. Our Supreme Court has noted "the drafters of the Model Penal Code recognized that 'many mentally disturbed persons are [quite] capable of acting purposefully or knowingly in the minimal senses intended by the Model Code.' " *Ibid.* (citations omitted)

*State v. Reddish*, Indictment No. 96-02-0195, 2008 WL 2755844, *4 (N.J. Super. Ct. App. Div. July 17, 2008).

As the excerpt from the state court opinion indicates, at the time of trial, Petitioner did not establish that he had a history of mental health issues. Moreover, his remorseful or emotional behavior days after his girlfriend's death was not indicative of the state of mind required by the

legislature to commit the particular degree of the crime charged. Thus, Petitioner has failed to show deficient performance or *Strickland* prejudice. The Appellate Division's rejection of Petitioner's claim was not an unreasonable application of clearly established federal law to the facts of Petitioner's case. Petitioner is not entitled to *habeas* relief on this claim.

### 3. Ineffective Assistance of Counsel for Failing to Move to Suppress Petitioner's Statement to Police

Petitioner next submits that counsel's failure to move for suppression of Petitioner's spontaneous statements to law enforcement was ineffective. (ECF No. 6-3 at 46-47). On May, 18, 1999, Petitioner, who was not yet identified as a suspect in the decedent's death, was involved in a car collision in Elizabeth, New Jersey. (ECF No. 12-8 at 45-46). Responding officer Raul DeLaprida testified that Petitioner was walking down the side of the highway covered in blood. (*Id.* at 46). Once an ambulance arrived, Petitioner told the emergency worker that he did not want medical treatment because he wanted to kill himself. (*Id.*). Once at the hospital, Petitioner repeated that he wanted to kill himself as a result of family problems. (*Id.*). Petitioner was not detained by law enforcement, presumably because of the fact that decedent's remains had not yet been discovered and Petitioner was not linked to any investigation at that point. Petitioner now submits that these voluntary, spontaneous statements should have been suppressed "as excited utterances" and his counsel's failure to move for such was ineffective. The state court rejected Petitioner's claim as "meritless." *Peterson*, 2012 WL 3870319 at *3.

Petitioner does not provide a valid legal basis for this claim. Furthermore, his reference to the statements as inadmissible "excited utterances" appear to misinterpret the hearsay exception. Construing Petitioner's claim liberally, this Court does not find that Petitioner's statements were either violations of his Fifth Amendment rights or a violation of rights under the Sixth

Amendment's Confrontation Clause. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), articulated the warning that police should provide before conducting a custodial interrogation, which include the right to remain silent and the right to the presence of an attorney. Indeed, "a defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999).

Here, Petitioner was by no means a suspect in a crime nor was he in custodial interrogation when he made the challenged statements to Officer DeLaprida and his partner. The record is clear that the officers responding to a car collision, spoke with Petitioner both at the accident scene and at the hospital about why he refused medical treatment, but that was the extent of his interaction with law enforcement. Although Petitioner referenced his having family problems that made him want to take his life, he by no means made any comments that would arguably implicate him in a crime.

As to Petitioner's argument that his statements should have been suppressed pursuant to the hearsay rule's excited utterance exception, Petitioner misconstrues this exception.

> The "excited utterance" exception to the hearsay rule is a long recognized one. It is incorporated into the Federal Rules of Evidence in Rule 803(2) which provides that an "excited utterance" is admissible as an exception to the hearsay rule as long as it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The applicability of the exception is unaffected by the availability or unavailability of the declarant as a witness. Fed.R.Evid. 803.

> The rationale for the excited utterance exception lies in the notion that excitement suspends the declarant's powers of reflection and

> fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.

*United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001) (citations omitted).

Here, Petitioner was arguably still under the stress of the car accident that prompted the police officers' arrival on the scene. Petitioner, who was covered in blood, according to the responding officer, initially rejected medical care and explained that he wanted to commit suicide. These statements were presumably admissible as excited utterances. Not raising this meritless issue cannot support defendant's claim of counsel's ineffectiveness. As such, the state court's decision was not contrary to clearly established federal law.

### 4. Ineffective Assistance of Trial Counsel for Failing to Move to Suppress Portions of Investigator Racioppi's Testimony

Petitioner next claims that his trial counsel's failure to move to suppress portions of Investigator Racioppi's testimony was ineffective. While Respondents maintain this claim is procedurally barred, this Court denies the claim on the merits. *See Bronshtein*, 404 F.3d at 707-710. At trial, Investigator Frank Racioppi of the Essex County Prosecutor's Office testified about his role in the decedent's murder investigation, which included crime scene examination, crime scene photography and evidence collection. (ECF No. 12-5 at 57). Among the evidence collected were pieces of the bloodied mattress in the decedent's bedroom. (ECF No. 12-7 at 29-30). Four sections of the mattress were removed to be submitted for laboratory analysis. (*Id.* at 30). The four sections were labeled by the investigator as items 10, 22, 23 and 24. (*Id.* at 30-31). The State Police laboratory re-labeled the four mattress pieces as 10, 19, 20 and 21. (*Id.* at 32). Investigator Racioppi explained that the testing process generally includes two steps, first, a presumptive test to determine whether the evidence contains blood, and second, a test to determine whether that blood is human blood. (*Id.*). With respect to the four pieces cut from the mattress, the state lab

results provided that only one patch was positively tested for blood and that none of the patches were subjected to DNA analysis. (*Id.* at 33).

Petitioner submits that trial counsel's failure to object to the aforementioned testimony was ineffective. He argues that despite this testimony, there was in fact no scientific testing in his case. (ECF No. 6-3 at 50). While Investigator Racioppi's testimony provided that the mattress was not subjected to DNA analysis, Petitioner's claim that there was no scientific testing in his case is contrary to the evidence. Forensics expert Thomas Lesniak's testimony included a description of positive test results linking blood stained shoe impressions on the hardwood floor that corresponded with Petitioner's size 13 Hush Puppies shoes. (ECF No. 12-8 at 10-11). Furthermore, DNA analysis expert Maureen Lowbeer's testimony provided that Petitioner was the source of DNA for stains found on several items taken from the crime scene including a knife, wallet, men's work pants, men's sneakers, decedent's purse as well as the jacket and shoes that she was wearing when she was found dead. (*Id.* at 61, 63-64).

The evidence refutes Petitioner's argument that there was no scientific testing in this case. Here, trial counsel's failure to raise an objection to Investigator Racioppi's testimony about the mattress was not deficient. Moreover, Petitioner was not prejudiced by counsel's not raising this issue because Investigator's Racioppi's challenged testimony was not prejudicial to Petitioner. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") (citations omitted). Accordingly, the Court dismisses this claim.

### 5. Ineffective Assistance of Counsel for Failing to Engage in Communication with Petitioner about Plea Negotiations and his Potential Sentence Exposure

Next, Petitioner claims that counsel's failure to adequately consult him on the plea negotiations with the prosecution as well as advise him of his potential sentencing exposure was

ineffective assistance. (ECF No. 6-3 at 53). Petitioner makes this comprehensive argument in "Ground Twelve" of his petition and also raises the same claims separately in "Ground Fourteen" and "Ground Fifteen," but provides minimal additional facts or arguments. The Appellate Division denied these claims as "unsubstantiated." *Peterson,* 2012 WL 3870319, at *5. This Court will address the three claims simultaneously.

First, Petitioner argues that he was unaware that he could be sentenced subject to the "Three Strikes Law" as a result of his criminal history. (ECF No. 6-3 at 59). He does not provide any facts to support this claim. As the Appellate Division pointed out, "he does not state counsel did not review the issues or discuss his plea exposure with him." *Peterson*, 2012 WL 3870319, at *5. Implicit in Petitioner's argument is that had he been aware of his potential sentence exposure, he would have pleaded guilty.

Rule 2(c) of the Rules Governing *Habeas Corpus* Cases, 28 U.S.C. § 2254, expressly provides, in part, that the petitioner "shall set forth in summary form the facts supporting each of the grounds" specified in the petition. The Court of Appeals for the Third Circuit specifically has held that "[a *habeas* petitioner] cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention." *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir.1991) (citations omitted).

Here, Petitioner has not established how his awareness of the potential sentence exposure would have resulted in a lower sentence. *See United States v. Day*, 969 F.2d 39, 44 (3d Cir. 1992) ("Even if [Petitioner] received substandard assistance from counsel, to justify relief he must prove sufficient prejudice.")

> In order to complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented. This further showing is of particular importance because a defendant has no right to be offered a plea, . . . ."

*Missouri v. Frye*, 566 U.S. 134, 148 (2012) (citations omitted). The record reflects that there was no plea offer in this case. (ECF No. 12-14 at 4). Petitioner cannot meet the prejudice prong of the *Strickland* test, and he is not entitled to relief on this claim.

Petitioner also argues that trial counsel failed to communicate with him about the status of plea negotiations. Petitioner does not provide any facts to support this allegation other than a reference to trial counsel's refusal to conduct a video conference with Petitioner. (ECF No. 6-3 at 53). He also submits that Petitioner's absence from an in-chambers "*ex parte*" conference with the presiding judge and both counsels, was emblematic of counsel's ineptitude at advising him of the developments in the case. (*Id.*). Petitioner describes this conference in a separate claim that addresses PCR counsel's ineffectiveness. Petitioner alleges that the parties signed a pre-trial memorandum at this June 27, 2001, conference.

It should be noted that Petitioner's trial did not commence until January 2003, and Petitioner readily admits that a superseding indictment was filed on August 16, 2002, almost two months after this purported in-chambers conference occurred. (ECF Nos. 12-5, 6-3 at 55). Petitioner has not provided any facts about what the pre-trial memorandum entailed or how his attorney's failure to secure Petitioner's presence for an in-chambers conference constituted ineffectiveness.

The Appellate Division looked to both the prosecutor's arguments at the PCR hearing as well as the PCR Court's reasoned opinion of why this claim fails.

> As the PCR judge noted, "[defendant] was not deprived or prejudiced in any way by his absence if indeed he wasn't present [at the pre-trial conference], because plea discussions are not cut off by the signing of a pre-trial memorandum in a homicide case." This fact is verified by the pre-trial memorandum, which states a negotiated plea may be accepted by the court with "approval of the Criminal Presiding Judge or his designee."
>
> Finally, the assistant prosecutor's comments during the PCR hearing suggest "informal" plea negotiations were held. Also, defendant's pleadings, vowing he "would have authorized [trial counsel] to engage in plea negotiations" had he known the full scope of his potential sentence, reflect that he had discussed a possible plea with his attorney. The June 27, 2001, pre-trial memorandum shows the State declined to make a plea offer as it reflects "NO OFFER" was being made to defendant.

*Peterson*, 2012 WL 3870319, at *5.

Both the United States Supreme Court and the Third Circuit have articulated the extent of a defendant's right to be present.

> The Due Process Clause of the Fifth and Fourteenth Amendments guarantee a criminal defendant the right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Stincer*, 482 U.S. at 745, 107 S.Ct. 2658 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). Rather, the defendant's right to be present extends to "any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 754, 107 S.Ct. 2658. There is no constitutional right to be present "when presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts*, 291 U.S. 97, 106–07, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled on other grounds in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

*Ross v. Dist. Att'y of the Cty. Of Allegheny*, 672 F.3d 198, 212 (3d Cir. 2012)

Here, Petitioner has not established how this in-chambers conference at a rather early stage in the case, was "critical." *Stincer*, 482 U.S. at 745 (the defendant's right to be present extends to "any stage of the criminal proceeding that is critical to its outcome"). The in-chambers conference was presumably an opportunity for both sides' counsels to make representations to the trial judge with the knowledge that many more proceedings lay ahead, at that early juncture in a murder case. The benefit of Petitioner's presence would be "but a shadow." *Id.* Lastly, Petitioner's own submission that both his trial counsel and the prosecutor were present at the conference refute his characterization that it was an *ex parte* proceeding.

The Appellate Division determined that there was no ineffective assistance in light of this record. The Appellate Division's determination was not contrary to clearly established federal law. Thus, Petitioner is denied *habeas* relief on this claim.

### 6. Ineffective Assistance of PCR counsel

In his final ineffective assistance claim, Petitioner asserts that he suffered ineffective assistance of PCR counsel during his state collateral review proceedings. (ECF No. 6-3 at 55-57). Respondents submit that this claim is procedurally barred, nonetheless, this Court denies the claim on the merits. *See Bronshtein v. Horn*, 404 F.3d at 707-710. Pursuant to 28 U.S.C. § 2254(i), the "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief" in a *habeas* proceeding challenging a state court conviction. Petitioner's ineffective assistance of PCR counsel claims therefore provides no basis for *habeas* relief.

Next, Petitioner claims that the prosecutor's references during summation that Petitioner asserted his right to remain silent were prejudicial to his self-defense claim. (ECF No. 6-3 at 17).

Petitioner asserts that the prosecution "blunted, if not eviscerate[d]" his self-defense claim by highlighting that Petitioner did not take the stand to testify in his own defense.

> In *Griffin v. State of California*, the Supreme Court held "that the Fifth Amendment, in its direct application to the Federal Government ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). A remark is directed to a defendant's silence when "'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir.1982) (quoting *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.1971)). Statements regarding the "absence of facts in the record[,]" however, "need not be taken as comment on [a] defendant's failure to testify." *Bontempo*, 692 F.2d at 959 (citing *Braxton v. Estelle*, 641 F.2d 392, 397 (5th Cir.1981)); *see also Brown*, 254 F.3d at 462–63 (statements by prosecutor in summation did not impermissibly comment on defendant's silence or shift burden of proof to the defense); *United States v. Isaac*, 134 F.3d 199, 206–07 (3d Cir.1998) (prosecutor did not violate 5th amendment by stating in his closing argument that "[the defendant] captained that boat from Jamaica, and the only people who would know that [the defendant] captained that boat from Jamaica are [the defendant], Conrad Brown, Irvin Reid, and that fourth individual in Jamaica. Those are the only people").

*United States v. Brennan*, 326 F.3d 176, 187 (3d Cir. 2003).

Petitioner challenges the following statement during the prosecutor's summation, to which defense counsel promptly objected: "The first time you heard self-defense, Ladies and Gentlemen, was today, and you've heard no evidence of it from the witness stand." (ECF No. 12-10 at 52).

> MR. MCMAHON: Judge, I have no recourse but to ask for a mistrial at this point in time. The prosecutor just said that, "The first time I heard anything about self-defense was today, and I didn't hear anything from the witness stand." That is a clear, clear comment on the fact that Mr. Peterson did not testify in this case. There is no remedy under the case law for such gross, unfortunately [*sic*] malfeasance except for the Court to order a mistrial, and that's the remedy I'm requesting at this time.
>
> THE COURT: Any comment, Ms. Cosgrove?

MS. COSGROVE: Yes, Judge. Counsel did not open to self – defense. There was no evidence presented with regard to self-defense, and if counsel had let me continue, I would have commented on the fact that the defendant made statements to both Wiltshire and to Cintron and never indicated that there was any evidence or that there was any evidence or that there was any existence of self-defense or any type of attack.

MR. MCMAHON: Judge, it's up to the Court to protect the defendant from what can only be termed gamesmanship, and that's clearly what this was. It was a direct - - I mean, how much more direct could you be a comment on Mr. Peterson's failure to testify in this case? That's what it was, that's its sole purpose, and that's why it was said, and that why I ask for the remedy I ask for.

THE COURT: Well, I don't necessarily agree, Mr. McMahon, that the implication would suggest that the defendant's testimony has anything to do with that point is involved. I will remind the jury that they will be instructed with regard to the defense of self defense because the testimony supports or supplies a reason for that and their recollection should control with regard to their recall about that testimony. I will deny your application for a mistrial because, as I've said, the comment does not point to the defendant or the defendant's election not to testify in this trial.

(ECF No. 12-10 at 52).

Following this colloquy at the bench, the Court provided the following curative instruction

to the jury.

I decided, outside of your presence, that somewhere in the evidence, in all the evidence, the testimony that you heard, that there was a basis to instruct you on the law of self-defense.

It is your recall of the testimony and evidence that controls. Because the testimony of certain witnesses in this case may give you a basis to decide, along with everything else you are required to decide in this case, whether the defendant acted in self-defense, that's why you'll be instructed when I give my instructions to you tomorrow about that. Is that clear?

(*Id.* at 54-55).

Here, the prosecutor's comments were not an improper reference to Petitioner's decision

not to testify at trial, but rather a reference to evidence that was not offered by witnesses who did

testify. The record reflects that both law enforcement officials who spoke with Petitioner after the

murder and Eric Wiltshire, whom Petitioner made an admission to in jail, never testified that

Petitioner indicated that his actions were in self-defense.

> "[T]here is nothing improper about a prosecutor "attempt[ing] to
> focus the jury's attention on holes in the defense's theory." *United
> States v. Balter*, 91 F.3d 427, 441 (3d Cir.1996). "Such a comment
> does not implicate any of the burden-shifting concerns that are
> raised when a prosecutor points to a defendant's failure to testify or
> improperly suggests that the defendant has the burden of producing
> evidence." *Id.* Such is the case here the prosecutor's references to
> "dilemmas" that "burdened" the defense were attempts to focus the
> jury's attention on perceived deficiencies in the defendants' theory
> in light of the evidence presented at trial.

*United States v. Lore*, 430 F.3d 190, 213 (3d Cir. 2005).

The Appellate Division, which addressed this particular claim on Petitioner's direct appeal,

found the prosecutor's comments to be vague enough to not trigger Petitioner's right to not testify.

"The broad nature of her statement could have applied equally to the lack of forensic or expert

evidence supporting defendant's claim." *State v. Peterson*, No. 02-08-3082-I, 2006 WL 533109

at *2 (NJ. Super. Ct. App. Div. 2006). The state court's reasoned opinion was not contrary to

clearly established federal law. *See Lockett v. Ohio*, 438 U.S. 586, 595 (1978) (referring to the

State's evidence as unrefuted and uncontradicted did not violate constitutional prohibitions in the

context of the defense offered during trial). Thus, *habeas* relief is denied on this claim.

Petitioner makes also makes several claims of trial error in his *habeas* petition. This Court

finds the respective claims unmeritorious and Petitioner is denied relief on each of the following

claims.

### 1. Trial Court's Erroneous Evidentiary Rulings

First, Petitioner claims that the trial court's admission of statements made by the decedent to her friend and neighbor, Towana Floyd, violated his Sixth Amendment rights under the Confrontation Clause. Additionally, he asserts, it was also prejudicial evidence of the "discord" in their relationship. (ECF No. 6-3 at 18-20, 38-41). Next, Petitioner argues that the trial court's admission of written correspondence between Petitioner and the decedent was erroneously admitted despite its also being a Confrontation Clause violation and evidence of Petitioner's "bad conduct." (*Id.* at 19-24). Petitioner raises these claims in "Ground Two," "Ground Three" and "Ground Seven" of his federal *habeas* petition. This Court will address all three claims simultaneously.

The trial court held a pre-trial hearing to determine the admissibility of the proffered testimony and exhibits. (ECF No. 12-4). With respect to the verbal statements to Floyd, the prosecution proffered that these statements qualified under both the excited utterance and present sense impression exceptions to the hearsay rule. (*Id.* at 27). Petitioner's trial counsel argued that the decedent's comments to Floyd did not fall under any hearsay exception. As far as the numerous letters between Petitioner and decedent, the prosecution proffered that they established Petitioner's motive and that "[i]t was a very controlling relationship where the defendant was incredibly manipulative of Ms. Bell, which would then explain why she did not put him out sooner or why, in fact, she even let him in in the first place." (*Id.* at 47).

At trial, Floyd testified about the decedent's describing the strife in her relationship with Petitioner as a result of his pawning her personal items. Specifically, Floyd testified about two separate occasions where she observed the decedent's angry reaction to finding that Petitioner took her jewelry and electronics from her home to pawn and decedent's subsequent decision to have

22

the locks to her home changed. (ECF No. 12-5 at 22- 23). Correspondence between Petitioner and

the decedent that spanned over the course of several months was also admitted into evidence. (ECF

No. 12-6 at 26, 29-30).

On Petitioner's direct appeal, the Appellate Division concluded that the challenged

evidence met the requirements of the hearsay exceptions and was therefore not erroneous. It did

not address Petitioner's claim within the context of the alleged Confrontation Clause violation.

> Defendant also argues the trial court erred when it admitted testimony from a neighbor regarding Belle's angry visit to the neighbor's apartment after Belle discovered that defendant had stolen from her and how the neighbor assisted Belle in finding a locksmith to change her door locks.
>
> A trial court is afforded considerable latitude in deciding to admit or exclude evidence, and its decision will be reversed only if it constitutes an abuse of that discretion. *State v. Feaster*, 156 N.J. 1, 82 (1998). Here, the court was correct in admitting this evidence under the present sense impression exception to the hearsay rule. N.J.R.E. 803(c)(1).
>
> There was sufficient evidence in the record to support an inference that Belle came to her friend's apartment immediately after she returned home and discovered the thefts. Belle was aware of her friend's work schedule and was "upset," and "screaming" that she had discovered missing jewelry and money. Both the timing and Belle's excited, emotional state support the inference that she returned home from work, discovered the thefts, and immediately went to her friend's apartment for solace. A similar explanation justifies the admissibility of the testimony regarding Belle's discovery of pawn receipts on her table.
>
> Defendant's pro se argument that this evidence was irrelevant and prejudicial also lacks merit. The evidence was relevant to the State's theory of defendant's motive for the murder, which was that he killed Belle when she threatened to throw him out and cut off his "gravy train." The prejudice from the friend's testimony was minimal because the State presented additional evidence of defendant's thefts, including the pawn tickets and testimony from the pawn broker himself.

Defendant also argues that the court erred in admitting Belle's letter to defendant explaining that she did not want to live with him any longer and revealing prior threats to the victim by defendant. Defendant contends that the letter was inadmissible hearsay because Belle's state of mind was not at issue in that "there was no showing that Debbie Belle feared defendant." He contends that the admission "was not harmless, as the alleged motive and/or intent by defendant illustrated by ... her letter to defendant ... significantly diminished defendant's self-defense claim."

Hearsay evidence of a victim's state of mind or fear of a defendant is not admissible to prove a defendant's motive or state of mind. *State v. Marshall*, 123 N.J. 1, 113 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L. Ed.2d 694 (1993); *State v. Machado*, 111 N.J. 480, 486 (1988). However, as an exception to that rule, the victim's statements of fear generally are admissible when the defendant claims he or she acted in self-defense. *State v. Benedetto*, 120 N.J. 250, 257 (1990).

That was precisely the claim in this case. Defendant did not dispute that he had killed Belle. Instead, he portrayed Belle as the aggressor who attacked him with the ornamental knife when he arrived home, which prompted him to strike back in self-defense. Belle's expressions in the letter that described defendant as abusive, although not physically, therefore, would be relevant to disputing the picture of Belle as the aggressor.

In addition, in this case the letter was admissible "as background to establish the nature of the relationship between the victim and the defendant." *Machado*, supra, 111 N.J. at 489. The victim's statements in the letter set the context for defendant's threatening letter in response and create "a mosaic of the criminal event," for the jury's understanding. *State v. Baldwin*, 47 N.J. 379, 394, cert. denied, 385 U.S. 980, 87 S.Ct. 527, 17 L. Ed.2d 442 (1966).

Defendant further argues that the trial court erred when it admitted evidence of threatening letters defendant wrote to Belle. Defendant contends the probative value of the "profanity-laced letters," written at least five months before the murder, did not outweigh their "significant prejudicial impact."

Evidence of prior threats by a defendant towards a victim is admissible under N.J.R.E. 404(b) to prove intent as well as motive. *State v. Ramseur*, 106 N.J. 123, 266 n. 60 (1987). Here also, we cannot say that the trial court erred in admitting this evidence. *See State v. DiFrisco*, 137 N.J. 434, 496 (1994), cert. denied, 516 U.S.

> 1129, 116 S.Ct. 949, 133 L. Ed.2d 873 (1996); *State v. Cofield*, 127
> N.J. 328, 338-39 (1992). In our view, the negative picture that the
> letters painted of defendant paled in comparison to the extensive
> testimony regarding the bloody and brutal nature of Belle's murder.
> Any prejudice generated by the letters did not outweigh their
> probative value.

*State v. Peterson*, No. 02-08-3082-I, 2006 WL 533109 at *2-4 (N.J. Super. Ct. App. Div. Mar. 6, 2006).

The Confrontation Clause of the Sixth Amendment protects a criminal defendant "*only* against the introduction of testimonial hearsay statements, and [the] admissibility of nontestimonial hearsay is governed solely by the rules of evidence." *United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012) (emphasis added); *see also Michigan v. Bryant*, 562 U.S. 344, 352-54 (2011); *Wharton v. Bockting*, 549 U.S. 406, 419-20 (2007); *Davis v. Washington*, 547 U.S. 813, 823-24 (2006). "[W]here nontestimonial hearsay is concerned, the Confrontation Clause has no role to play in determining the admissibility of a declarant's statement." *Berrios*, 676 F.3d at 126. The Confrontation Clause inquiry is therefore a two-step process: courts must first determine whether a given out of court statement is testimonial, the inquiry is limited solely to whether the statement was properly admitted under the appropriate rules of evidence. *Id.* Where a statement is testimonial in nature, however, it may only be admitted where the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.* (*citing Crawford*, 541 U.S. at 68).

Thus, the first question a court must answer when determining the admissibility of statements by out of court declarants is whether the statements at issue were testimonial in nature. The Supreme Court in *Crawford* chose not to endorse any specific definition of "testimonial," instead noting that the statements made to police in the course of an interrogation in that case were testimonial regardless of how narrow the standard was. *See United States v. Hendricks*, 395 F.3d

173, 179 (3d Cir. 2005). The *Crawford* Court did consider three potential definitions, however: "*ex-parte* in-court testimony or its functional equivalent," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements [such as] those 'made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial." *Id.* at 179-80 (quoting *Crawford*, 541 U.S. at 51-52). Based on the caselaw, it is clear that statements made in the course of an interrogation are virtually always testimonial, while surreptitiously monitored conversations generally are not. *Berrios*, 676 F.3d at 127-28.

In addition to precluding the admission of certain forms of testimonial hearsay, the Sixth Amendment right "to be confronted with the witnesses against him," also "includes the right to conduct reasonable cross-examination." *Wright v. Vaughn*, 473 F.3d 85, 93-94 (3d Cir. 2006) (internal quotations omitted). A criminal defendant can therefore state a violation of his rights under the Confrontation Clause "by showing that he was prohibited from engaging in otherwise appropriate cross-examination" which would "expose the jury [to facts] from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). The Confrontation Clause is not unlimited in scope- cross examination is still subject to the discretion of trial judges to curtail improper questioning and to limit repetitive and otherwise irrelevant testimony on cross-examination. *Wright*, 473 F.3d at 93. Allegations that a trial court's rulings curtailing a Petitioner's cross-examination of a witness violate the Confrontation Clause, however, are subject to harmless error analysis. *Id.* (citing *Van Arsdall*, 475 U.S. at 684). When raised on collateral review, errors of even a constitutional dimension will be considered harmless and thus will not warrant *habeas* relief "unless the [alleged constitutional error] had a substantial and

injurious effect or influence in determining the jury's verdict." *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

a. <u>Statements Decedent Made to Floyd</u>

Petitioner has not established that the trial court's admission of these statements amounted to a Confrontation Clause violation. In this case, the declarant made the statements to her neighbor as soon as she discovered the missing items and the pawn shop receipts. There is no indication that she conveyed this information to Floyd in the presence of law enforcement or that she ever sought law enforcement's assistance in helping her resolve her issues with the Petitioner. These statements would not qualify as testimonial under the Confrontation Clause rubric. *Berrios*, 676 F.3d at 127-28.

Nonetheless, the question of whether the statements were properly admitted under the rules of evidence remains. Floyd's testimony helped establish that Petitioner exploited the decedent for financial gain by going as far as stealing her belongings to pawn, and this became a major source of contention between the two. While the testimony was obviously unfavorable to the Petitioner, it provided appropriate context for the strain leading up to the murder. Moreover, it established Petitioner's motive for responding so violently to the decedent's mounting manifestation of her frustration such as changing the locks to her apartment. *See Lesko v. Owens*, 881 F.2d 44, 53 (3d Cir. 1989) ("It is generally recognized that evidence of motive may be probative of specific intent . . . ."). Therefore, the Appellate Division's determination that this was properly admitted as evidence of Petitioner's motive to kill the decedent, was not an unreasonable application of federal law.

b. Letters Between Petitioner and the Decedent

Turning to the challenged correspondence between Petitioner and decedent, where she described Petitioner's verbal abuse and her desire to distance herself from him, Petitioner has not demonstrated how these statements violate his Sixth Amendment Confrontation Clause rights. Similar to the statements that the decedent made to Floyd, these letters highlighted the strain in the relationship as well as the decedent's concern about Petitioner's behavior towards her.

Finally, with respect to Petitioner's claim that his threatening letters to the decedent were improperly admitted as evidence of propensity to commit the crime, the Appellate Division determined that these letters helped establish intent and motive. *Peterson*, 2006 WL 533109 at *4. The letters written by the Petitioner to decedent, albeit filled with profanity and commands to the decedent, do not suggest criminal or untoward behavior. (ECF No. 12-6 at 25-26). They do however, demonstrate Petitioner's domineering ways over the decedent and just how upset he would be as a result of her not complying with his wishes. *See Richardson v. Ricci*, No. 10-4954, 2013 WL 3863994, *11 (D.N.J. July 24, 2013) ("Such evidence was not to be treated as evidence of criminal propensity. Rather, it could be considered only as proof relating to such relevant issues as the parties' relationship; their states of mind; the background and context of the killing; and the plausibility, or not, of self-defense as a motive.")

Petitioner has not established how Petitioner's statements to Floyd nor her correspondence with Petitioner violated his Confrontation Clause rights. Moreover, the state court's determination that Floyd's testimony as well as Petitioner's letters to the decedent established motive, was not an unreasonable application of clearly established federal law. Accordingly, Petitioner's claim is denied.

2. **Trial Court's Jury Instruction on Consciousness of Guilt**

Petitioner next claims that the trial court erroneously instructed the jury on consciousness

of guilt based on his suicide attempt prior to being apprehended by law enforcement. (ECF No.

6-3 at 25-31). More specifically, Petitioner argues that the following instruction was "unsupported

by reasonable inferences." (*Id.* at 25-26).

> There has been some testimony in the case from which you may
> infer that the defendant attempted suicide shortly after the alleged
> commission of the crimes that he's charged with in this indictment.
> The question of whether the defendant attempted suicide after the
> commission of the crimes is another question of fact for you to
> determine.
>
> Injuries sustained in another way do not constitute attempted
> suicide. If you find that the defendant, fearing that an accusation or
> arrest would be made against him on the charges involved in the
> indictment, attempted suicide in connection with all of the other
> evidence in the case as an indication or proof of consciousness of
> guilt.
>
> Attempted suicide may only be considered as evidence of
> consciousness of guilt if you should determine that the defendant's
> purpose in trying to kill himself was to evade accusation or arrest
> for the offenses charged here in this indictment.
>
> If, after consideration of all the evidence, you find that defendant,
> fearing that an accusation or arrest would be made against him on
> the charges involved in this indictment, attempted to commit suicide
> for the purpose of evading the accusation or arrest, then you may
> consider such attempted suicide in connection with all the other
> evidence in the case as an indication or proof of consciousness of
> guilt.
>
> It is for you, as judges of the facts, to decide whether or not evidence
> of attempted suicide shows a consciousness of guilt and the weight
> to be given such evidence in light of all the other evidence in the
> case.

(ECF No. 12-11 at 15-16).

> [Q]uestions relating to jury charges are normally matters of state law
> and not cognizable in federal *habeas* review. *See Engle v. Isaac,*

29

456 U.S. 107 (1982); *Henderson v. Kibbe*, 431 U.S. 145 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir.), cert. denied, 502 U.S. 902 (1991); *Grecco v. O'Lone*, 661 F.Supp. 408, 412 (D.N.J.1987). [T]he district court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson*, 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

*Porter v. Brown*, No. 04-4415, 2006 WL 2640624, at *8 (D.N.J. Sept. 12, 2006).

"In reviewing a jury instruction, we look to see if the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." *United States v. Hart*, 273 F.3d 363, 373 (3d Cir. 2001) (citation and quotation marks omitted). Here, the evidence, which included testimony from multiple responding personnel who observed Petitioner's demeanor immediately after his car collision and investigators who observed what were determined to be self-inflicted wounds on Petitioner's body at the time of his arrest, was available to the jury for its consideration.

The trial court held an evidentiary hearing and ruled the following were evidence of multiple suicide attempts: 1) Petitioner's apparently intentional car collision; 2) spontaneous statements to emergency personnel that he did not want medical care because he wanted to die; 3) evidence of self-inflicted wounds on Petitioner and his blood at the murder scene; and 4) his statements about his suicide attempts to fellow inmate Eric Wiltshire. (ECF No. 12-4 at 19). The Appellate Division did not address this particular claim in its opinion on direct appeal. However, the record reflects that the jury instruction was supported by evidence in the record and did not infect the entire trial with prejudice in violation of due process. Therefore, Petitioner is denied relief on this claim.

### 3. Trial Court's Failure to Provide Complete Witness Bias Instruction was Erroneous

Next, Petitioner challenges the trial court's failure to *sua sponte* instruct the jury that the expectation of favorable treatment on the part of a prosecution witness was error. (ECF No. 6-3 at 41-45). Petitioner argues that Eric Wiltshire's expectation of a favorable disposition in his own pending criminal case was a result of his cooperation in Petitioner's murder trial and necessitated an instruction that reflected that. The record reflects that on direct examination, Wiltshire disclosed that he informed the prosecution of Petitioner's prior statements implicating himself in the murder, with the hope that he would receive a benefit and he was heavily cross examined on the matter as well.

On direct appeal, the Appellate Division rejected this claim, determining that the trial court provided an instruction about considering interest or bias when assessing witness credibility and "that any error in the credibility charge was certainly harmless." *Peterson*, 2006 WL 533109 at *4. In this case, the Petitioner's "burden is especially heavy because no erroneous instruction was given; his claim of prejudice is based on the failure to give any explanation . . ." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* Petitioner has not established that the trial court's failure to provide the instruction violated his due process. Consequently, the Appellate Division's determination was not an unreasonable application of clearly established federal law. Petitioner's claim is denied.

### 4. Trial Court's Failure to Substitute Counsel

Additionally, Petitioner asserts that the trial court erroneously denied his motion for new counsel despite the apparent conflict between himself and his trial counsel. (ECF No. 6-3 at 34-

37).  Respondents assert that this claim is also procedurally barred.  This Court denies the claim on the merits.  *See Bronshtein*, 404 F.3d at 707-710.

Petitioner alleges that his growing concern over his trial counsel, John McMahon's, representation resulted in his sending constant correspondence to counsel with the hopes that he could be better informed about the status of his trial preparation.  (*Id.* at 34).  According to Petitioner, this constant stream of correspondence resulted in a letter from Michael Marucci, Esq.,[2] advising him "to stop pestering hi[s] attorney and to stop communicating with the trial judge." (*Id.* at 35).  Petitioner subsequently filed a 42 U.S.C. § 1983 complaint against his trial counsel and the Public Defender's Office as well as the County Prosecutor's Office, alleging that his trial counsel and the prosecutor were "conspiring together to deny the petitioner a fair trial." (*Id.*).  Petitioner does not allege that he personally notified the trial court of the pending litigation against his trial counsel, but argues that his counsel's failure to raise the issue with the court was an ethical violation. (*Id.* at 36).

It should be noted that Petitioner raised the issue of the supposed conflict with his attorney in his direct appeal within the context of an ineffective assistance of counsel claim.  This federal *habeas* petition is the first instance where he challenged the trial court's allegedly erroneous response to the conflict.  To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein*, 404 F.3d at 728  (considering procedurally defaulted claim, and stating that "[under 28 U.S.C. § 2254(b)(2),

---

[2] Petitioner does not provide any information about Michael Marucci's identity.

we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

"To protect a defendant's right to conflict-free counsel, a trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." *Bonin v. California*, 494 U.S. 1039, 1041 (1990).

> Good cause for substitution of counsel is defined as a "conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney." *United States v. Goldberg*, 67 F.3d 1092, 1098 (3d Cir.1995). A disagreement between the defendant and defense counsel over legal strategy does not constitute good cause requiring substitution of counsel, nor does a defendant's unilateral decision not to cooperate with court appointed counsel. *Id.* at 1098–99; *United States v. Gibbs*, 190 F.3d 188, 207 n. 10 (3d Cir.1999). A defendant's mere dissatisfaction with counsel also does not warrant substitution of counsel. *See United States v. Moses*, 58 Fed.Appx. 549, 555 (3d Cir.2003). Finally, if, after performing a proper inquiry, the trial court determines that good cause for substitution of counsel does not exist, then the court must "inform the defendant that he can either proceed with current counsel or represent himself." *Goldberg*, 67 F.3d at 1098.

*Caldwell v. Phelps*, 945 F.Supp.2d 520, 537 (D.Del. Mar. 15, 2013).

Here, the record is devoid of any information that suggests that the trial court was aware of the purported conflict. The trial court cannot be faulted for its supposed dereliction when it was not apprised of the pending litigation between counsel and Petitioner. For the foregoing reasons, Petitioner is denied relief on this claim.

## C. **PCR Court**

Finally, Petitioner contends that the state PCR court erred in denying relief on the claims submitted in his second PCR Petition. The Appellate Division rejected the claims as procedurally defaulted. (ECF No. 11-6 at 1-2).

> On August 13, 2013, defendant filed his second PCR application, which the trial court also denied. In that second petition, defendant

contended that he had been denied his right to due process because first, he was not present at a pretrial plea negotiation nor was he present when a pretrial memorandum was signed at a status conference, and, second, because the trial judge did not prepare a second pretrial memorandum. Defendant further claimed that his trial counsel had been ineffective for failing to explain his sentencing exposure. In addition, he alleged ineffective assistance of appellate counsel, but not of his prior PCR counsel on the first petition.

Rule 3:22-4(b)(2) sets forth the allowable grounds for second or subsequent petitions for PCR. That provision specifies that such a petition "shall be dismissed" unless it alleges either that: (1) it relies on a new rule of constitutional law; (2) it relies on a factual predicate that could not have been discovered earlier; or (3) it alleges ineffective assistance of counsel who represented defendant on an earlier petition.

A separate timing provision, Rule 3:22-12(a)(2)(C), requires that a second petition brought on one of those enumerated grounds be brought within one year of the occurrence upon which the second petition relies.

Here, it is manfest that the PCR judge properly denied defendant relief because he alleged none of the three cognizable issues that are permitted for second or subsequent petitions under Rule 3:22-4(b)(2). Defendant does not rely on any new rule of constitutional law. Nor does he rely on facts that could not have been discovered sooner. Moreover, he does not advance a claim that his counsel on his first PCR petition was ineffective.

Further, defendant has not attemped to justify the untimeliness of his second PCR petition by identifying a pertinent occurrence which happened within a year prior to its filing.

Because defendant's second PCR petition was clearly not in compliance with the Rules of Court, we summarily affirm, sua sponte, the dismissal of that defective petition.

(ECF No. 11-6).

A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. *See, e.g., Doctor* [*v. Walters*, 96 F.3d 675, 683 (3d Cir.1996)]. Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant

establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (emphasis added).

The Appellate Division affirmed the PCR court's denial of Petitioner's second PCR petition, as barred pursuant to Rule 3:22-12(a)(2)(C) and Rule 3:22-4(b)(2). (ECF No. 11-6).

A state rule is "adequate" for procedural default purposes if it was "firmly established, readily ascertainable, and regularly followed at the time of the purported default." *Szuchon v. Lehman*, 273 F.3d 299, 327 (3d Cir.2001). These requirements ensure that "federal review is not barred unless a *habeas* petitioner had fair notice of the need to follow the state procedural rule," and that review is foreclosed by "what may honestly be called 'rules' ... of general applicability[,] rather than by whim or prejudice against a claim or claimant." *Bronshtein v. Horn*, 404 F.3d 700, 707 (3d Cir. 2005).

*Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007).

"Federal *habeas* courts generally refuse to hear claims 'defaulted . . . in state court pursuant to an independent and adequate state procedural rule.'" *Johnson v. Lee*, 136 S. Ct. 1802, 1803 (2016) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). "State rules count as 'adequate' if they are 'firmly established and regularly followed.'" *Id.* (quoting *Walker v. Martin*, 562, U.S. 307, 316 (2011)).

Here, the instant claims are defaulted because the state appellate court declined to address them due to Petitioner's failure to raise them in his first PCR filing, and Petitioner does not argue that such rule is not firmly established nor regularly followed—indeed, New Jersey appellate courts frequently decline to consider claims that were not first raised in the lower court. *See State v. Robinson*, 200 N.J. 1, 20 (2009) ("It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available[.]") (quoting *Nieder v. Royal Indem. Ins. Co.*, 62

N.J. 229, 234 (1973)); *State v. Coleman*, Indictment No. 13-04-0210, 2016 WL 6937921, at *5 (N.J. Super. Ct. App. Div. Nov. 28, 2016); *State v. Dunlap*, Indictment No. 10-07-0983, 2016 WL 207616, at *1 n.3 (N.J. Super. Ct. App. Div. Jan. 19, 2016); *State v. Southerland*, Indictment No. 09-10-1750, 2015 WL 392172, at *7-8 (N.J. Super. Ct. App. Div. Jan. 30, 2015). Moreover, the Appellate Division has consistently upheld procedurally defaulted PCR denials pursuant to both Rule(s) 3:22-12(a)(2)(C) and 3:22-4. *See State v. Fleming*, Indictment No. 03-02-0286, 2016 WL 3449249 *3 (N.J. Super Ct. June 24, 2016) ; *see also State v. Messam*, Indictment No. 85-08-03187, 2015 WL 966027 *4 (N.J. Super Ct. App. Div. Mar. 6, 2015).

Petitioner continues to allege, as he did in his second PCR petition, that his trial, appellate and PCR counsels were all ineffective for failing to "review the pretrial record." (ECF No. 6-3 at 68). However, he has not alleged any facts to support cause to excuse his procedural default nor actual prejudice resulting from the alleged failure to object to a variety of supposed pre-trial errors. Nor has he demonstrated that failure to consider the claim will result in a fundamental "miscarraige of justice." To show a fundamental miscarriage of justice, a petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (quoting *Carrier*, 477 U.S. at 496). Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Once such evidence is presented, a petitioner must then show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327. Here, Petitioner has not presented any new evidence to demonstrate his innocence.

For the foregoing reasons, the claim is denied.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a *habeas* proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion that Petitioner's *habeas* petition is without merit, Petitioner has failed to make a substantial showing of the denial of a constitutional right and Petitioner's *habeas* petition is inadequate to deserve encouragement to proceed further. As a result, this Court will deny Petitioner a certificate of appealability.

"When the district court denies a *habeas* petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, jurists of reason would not find it debatable whether this Court is correct in its procedural ruling. Therefore, no certificate of appealability shall issue.

## IV. CONCLUSION

For the reasons expressed above, Petitioner's petition for a writ of *habeas* corpus is DENIED

and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

JOSE L. LINARES,
Chief Judge, United States District Court